**Affirmed and Memorandum Opinion filed June 25, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-19-00039-CV

## IN THE INTEREST OF E.C.S., A.M.B., T.J.B., AND K.S., CHILDREN

**On Appeal from the County Court at Law**
**Grimes County, Texas**
**Trial Court Cause No. 34,344-CCL**

## MEMORANDUM OPINION

The issues in this case involve whether the trial court's findings to terminate a mother's parental rights are supported by legally- and factually-sufficient evidence. This accelerated appeal arises from a final order in which, after a bench trial, the trial court terminated the parental rights of R.L.S. (Mother) with respect to her children, E.C.S. (Erin), A.M.S. (Alex). T.J.B. (Ted), and K.S. (Kevin),[1] and appointed the Department of Family and Protective Services to be the children's sole

---

[1] To protect the minors' identities, we have not used the actual names of the children, parents, or other family members. *See* Tex. R. App. P. 9.8.

managing conservator. *See* Tex. Fam. Code Ann. § 109.002(a-1). The trial court also terminated the parental rights of (1) J.B., Alex and Ted's father, (2) J.R.T., Kevin's father, and (3) the unknown father of Erin.

Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings (1) on the predicate grounds of endangerment, failure to support, constructive abandonment, failure to comply with a service plan, and use of a controlled substance in a manner that endangered the health and safety of the children, and (2) that termination is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (F), (N), (O), (P), (2). The fathers have not appealed the termination of their parental rights. We affirm.

## I. BACKGROUND

### A. Pretrial Proceedings

#### 1. Pretrial Removal Affidavit

In late 2017, the Department received a referral alleging neglectful supervision and physical neglect of all four children by Mother. The referral detailed concerns for Mother's ability to adequately protect and supervise the children as Mother allegedly would leave the children unsupervised for six to twelve hours at a time. At the time of the referral Erin was thirteen-years old, Alex was nine-years old, Ted was seven-years old, and Kevin was two-months old. The report also noted concerns about the condition of the home stating that the home was unsanitary and did not have working utilities.

Three days after the referral, Gloria Smith, an investigator with the Department, went to the family residence to interview the children and Mother and to conduct a home assessment. Mother was present while Smith interviewed the three older children. Ted told Smith they had six puppies living in the home and that

2

sometimes he "urinates off the front porch because their bathroom is broken." Ted told Smith that his Mother occasionally attended the Renaissance Festival on the weekends and left the children in the care of thirteen-year-old Erin. Ted said that sometimes the next-door neighbor also watched the children. At the time of the interviews Kevin, the infant, was in the care of the neighbors, Jenny Baker and Jerry Baker.[2]

Smith noted that the home was "generally cluttered and unkempt, and there was dog urine on the floor in the living room." The home had working electricity, but no running water. The home's walls and roof were damaged and appeared to be under construction. According to Mother, the children used the bathroom, showered, and brushed their teeth at Jenny's home.

Mother admitted that she was on deferred-adjudication probation for five years with three years remaining. The offense was food-stamp fraud. Mother denied going to the Renaissance Festival every weekend and denied leaving the children unsupervised. Mother reported that she occasionally worked on Saturday nights at the Renaissance Festival. Mother submitted to an oral drug-swab test, which later returned negative for all substances.

Due to the conditions of the home and possible neglectful supervision of the children, Smith asked Mother to sign and agree to a safety plan, which stated that Mother must clean the home and not leave the children unsupervised. Mother agreed to the terms of the safety plan.

Approximately one week later, investigator Holly Frankum made an unannounced visit to the residence to follow up on the progress of the safety plan. Frankum observed that the home still did not have running water and appeared to be

---

[2] Jenny and Jerry Baker are pseudonyms.

under renovation. Mother was still using the Bakers' home for the family's baths and the bathroom.

About one month after the referral, Smith returned to the home, but Mother was not home. While Smith was outside the home, Jenny spoke with Smith and expressed several concerns about the family. Jenny reported that Mother had been dishonest with the investigator about caring for the children and efforts to renovate the home. Jenny reported that she, rather than Mother, had been caring for Kevin since his birth. Jenny told Smith that Mother "leaves for days at a time and will not answer her phone or tell [Jenny] when she will return." Jenny reported that she cared for all four children during Mother's absences. Mother had not been trying to repair the home, clean it, or restore running water. There were six puppies living in the home "that urinate and defecate throughout the entire house." Jenny reported that the three older children occasionally spent the night with her and that she cared for the infant "full-time." Jenny reported that the children had been "urinating in the bathtub and defecating off the front porch." Jenny reported that Mother was lying about the children using her bathroom facilities at night, but that Jenny was ensuring that the children went to school and had a safe home.

The next day Jenny sent pictures of the inside of Mother's home. In the photographs, the home "appeared to be in a state of complete disarray and clutter." Jenny expressed "great concern for the unsanitary conditions of the home and the safety and wellbeing of the children."

Two days after receiving the pictures, Smith made an unannounced visit to the home. Smith described the inside of the home as "worse than my initial home visit, as the clutter and mess was spread through several rooms in the home." Smith observed a distinct odor of dog feces and urine and observed "numerous piles of feces on the floor throughout several rooms of the home." One room in the home,

4

which was accessible to the children, contained exposed insulation, screws, holes in the walls and floors, and exposed electrical wiring. The home smelled musty and was noticeably hot from lack of air conditioning. The living room was "cluttered with dirty laundry, construction tools, blankets, and various household items." The room where the children slept contained two air mattresses with blankets and pillows. Several windows in the home were broken, and there was mold or mildew on the ceiling in the bathroom. There was still no running water in the home.

When Smith discussed her concerns about the home, Mother agreed the home was not suitable for the children. Mother excused the state of the home stating that she had been gone the entire weekend and the six puppies had escaped from their room and destroyed the home. Mother admitted the children had been staying with Jenny. Smith and Mother then went to Jenny's home where Jenny was caring for Kevin. Jenny showed Smith where the children slept at her home. Smith noted that the space appeared appropriate and clean.

Jenny called Smith the next day and reported that the children's school had called her about Alex because they could not reach Mother. Alex had head lice again, and Jenny explained Alex had a recurrent problem with head lice. Jenny expressed concern for the children saying that she believed the children were being neglected. Mother had not yet taken Kevin to a doctor for a check-up or immunizations. Jenny took Kevin to the doctor. Kevin was diagnosed with thrush, an ear infection, and a cold. The doctor could find no record of any check-ups or immunizations since Kevin's birth.

That same day the social worker for the Waller Independent School District called Smith. The social worker had been unable to contact Mother despite multiple attempts to call and an attempted visit to the home. The social worker reported that Ted needed glasses to complete testing to assess his educational needs. The school

had been trying to work with Mother for weeks to get glasses for Ted but had not had any success.

The next day Smith interviewed Erin, the oldest child. Erin reported that her mother's house is usually dirty because the dogs destroy everything, and her mother does not clean. Erin described the house as "gross" and stated that Mother's room was covered in mold. Erin did not feel safe in the home because her bedroom window was broken. Erin reported that Mother was gone from home almost every weekend "because she goes out partying with friends, to the Renaissance Festival, or to her boyfriend's house." Erin reported that Alex contracted chicken pox because Mother never had her immunized. Erin described Mother as "angry, lazy, and irresponsible." She further reported that Mother lied about cleaning the house and that the children had done all the cleaning. This was consistent with Jenny's reports that the children had been cleaning the house, including the dog feces. All of Erin's clothes were dirty because Mother did not do any laundry. Erin stated that Mother blamed Erin for their house being dirty and the Department's intervention.

The same day as Smith's interview with Erin, Smith spoke with the principal, assistant principal, and counselor at the elementary school where Alex and Ted were enrolled. All three school officials were concerned that Mother had not followed through on getting glasses for Ted. They had explained to Mother there would be no charge for the glasses as they would be paid for by the Lion's Club. Mother's only responsibility was to schedule an appointment and take Ted to the doctor. Ted could not proceed with academic testing until he had glasses. The counselor reported that Ted had several "restroom accidents" at school, but the school was unable to contact Mother to get a change of clothes for him. The principal reported that the children had "a recurrent issue with head lice."

The next day Smith spoke with Officer Lyndall Barr with the Harris County

Sheriff's Office, who was personally familiar with the family. Barr stated that the family had been living in tents before she helped find the house where they were living at the time of the referral. Barr said that the children have had recurrent issues with head lice. Barr stated that when she had been to the home, the conditions were "deplorable." She stated that Mother had six puppies and two grown dogs inside the home that would defecate throughout the home and "created a potent odor of dog feces and urine." Barr stated that Mother left the children with Jenny for several days or even a week at a time to go to the Renaissance Festival or with her boyfriend. Barr advised that in the past, Mother left the children alone and they would hurt one another. She had witnessed bruises on Alex's face and "up and down her legs," which were caused by Alex's other siblings in Mother's absence. Barr advised that Mother blamed Erin "for everything, including stating that [Erin] is the reason Child Protective Services is investigating their family."

Four days after receiving Officer Barr's statement, the children were placed in Jenny's care, where they were safe. Jenny had expressed her desire to protect the children and provide long-term care, if necessary.

## 2. History of Department's Involvement with the Children

In 2005, when Erin was 18 months old, the Department received a referral alleging physical abuse by an unknown perpetrator. Erin had a bruise on her arm where she had been bitten. Despite Mother's inconsistent stories about how Erin had been injured the allegation was disposed as "unable to determine."

Five years later, shortly after Ted was born, the Department received a referral alleging physical abuse by Mother. Mother and the newborn Ted both tested positive for marijuana at Ted's birth. The family was referred for ongoing services with the Department through Family Based Safety Services (FBSS). Mother completed services approximately six months later.

When Kevin was born seven years later the Department received a referral alleging neglectful supervision of the newborn. Mother tested positive for marijuana when Kevin was born but Kevin's urine and meconium tests were negative for marijuana. The allegation of neglectful supervision was ruled out.

### 3. Mother's Criminal History

On June 12, 2013, Mother was placed on five years' deferred-adjudication probation for the state jail felony of theft of property valued between $1,500 and $20,000.

### 4. Family Service Plan

On January 8, 2018, the trial court signed an order requiring, among other things, compliance with the Department's family service plan. Mother's family service plan required her to:

- obtain and maintain a safe and stable home;
- allow Department caseworkers to make home visits announced and unannounced;
- obtain and maintain a stable and legitimate income;
- contact the Department caseworker at least twice a month;
- attend supervised visits with the children as approved and scheduled by the Department;
- sign a release of information with service providers to allow the Department to access information with service providers;
- attend individual counseling and follow recommendations;
- live a crime-free lifestyle and take care of pending charges;
- submit to random drug tests as requested by the Department;
- complete a drug and alcohol assessment and follow recommendations;
- complete a psychological evaluation and follow

8

recommendations; and

- follow probation requirements.

**B.     Final Hearing**

After opening statements, the Department requested that the trial court take judicial notice of its file. The trial court announced that it took judicial notice of its file.

Gloria Smith, the Department investigator, testified that the facts in the removal affidavit were within her knowledge and were accurate. The removal affidavit was admitted into evidence over Mother's objection. Smith testified to the events described in the removal affidavit, specifically that Mother consistently left the children unsupervised, and the home was unsanitary with no running water.

Smith testified to her first home visit in which Mother told her the home was under construction. Mother also admitted that she was on deferred-adjudication probation for food-stamp fraud, and denied the allegations contained in the referral. Mother explained that she occasionally worked weekends at the Renaissance Festival, but was not at the festival every weekend. Mother admitted her home had no running water, but said she used a local recreational-vehicle park or the neighbor's house for showers, bathrooms, and brushing teeth. Mother submitted to a drug test, which came back negative.

Smith described her interview with Ted and Ted's statements about the six puppies living in the home. Smith saw some of the dogs that were there. Smith testified that Ted, who was seven years old at the time, told her he sometimes would urinate off the front porch because the bathroom was not working. Ted said his older sister watched the children when Mother went to the Renaissance Festival for the weekend. Ted also told Smith that Jenny occasionally watched them when Mother was absent. Ted told Smith that the infant, Kevin, was always at Jenny's house.

9

Smith observed the home and found it "generally kind of cluttered and unkempt" with laundry piled in several places. Smith further observed dog urine on the floor in the living room and noted that the air conditioning was not working and there was no running water to the home. Smith observed debris including insulation and noted that the home appeared to be under construction. At that time, Smith's primary concern was the lack of running water, which meant that four children had no place to use the restroom or bathe. Also at that time, Mother agreed to a safety plan in which she agreed to clean the home and ensure that the children were not unsupervised. Mother agreed that Erin was not old enough to watch the children. Smith explained that she would return to follow up with Mother on her progress.

When Smith returned to the home, Mother was not there. Jenny came out of her home and "flagged [Smith] down" to express her concerns about the family. Jenny reiterated the concerns that the Department already had noted, including the condition of the home, the children left unsupervised for long periods, and the newborn left in Jenny's care. It did not appear to Smith that Mother made any effort to restore running water to the home. Smith was told by several people that the children urinated in the bathtub and defecated off the front porch. Jenny sent photographs to Smith of the inside of the home. The photos showed the bathroom "overflowing with like dirty diapers," laundry "piled in different places," and construction debris including insulation and exposed wires. The baby's crib was "piled with a lot of clothes and things that – just not acceptable for a baby to sleep in." Jenny kept the infant Kevin at her home full time.

Photographs were admitted into evidence that showed several piles of dog feces on the floor of the room where the children were supposed to be sleeping. There was an air mattress on the floor with the dog feces. One of the children reported that one of the air mattresses had been punctured by one of the dogs.

Another photo showed the front bedroom full of trash including insulation, construction debris, and feces. There was no visible furniture in the front bedroom.

Smith's next unannounced visit showed a decline in the home's condition. The "clutter and mess" had been spread throughout several rooms, and the home smelled of feces and urine. Rooms that were accessible to the children contained insulation, exposed screws, holes in the walls and floors, and exposed electrical wiring. There still was no running water. The children's bedroom also had a broken window. Mother admitted the home was not suitable for the children. As an excuse, Mother told Smith she had been gone for the entire weekend and that the puppies had escaped their room and "wreaked havoc on the home." Mother said the children had stayed at Jenny's house that weekend.

Jenny contacted Smith and reported that the children's school had called to report that Alex had head lice. The school was unable to get in touch with Mother to report the head lice. Jenny told Smith that Mother had taken the six puppies to a veterinarian to get immunizations, but had not taken her infant son to a doctor to have him immunized. Jenny also reported that Mother forced the children to clean the inside of the home including cleaning around construction debris and cleaning up dog feces and urine.

The day that Jenny contacted Smith, the social worker from the children's school also contacted Smith because they were unable to make contact with Mother. The social worker reported that Ted needed academic testing, but it could not be administered until Ted got glasses. Jenny subsequently took Ted to the doctor to get glasses. Jenny also took Kevin, the infant, to a pediatrician. The pediatrician diagnosed Kevin with thrush, an ear infection, and a cold. The doctor was unable to find any record of previous check-up appointments or immunizations for Kevin.

In Smith's investigation she confirmed Jenny's reports with other sources.

Part of Smith's confirmation came from interviews with school authorities and with the older children. Smith interviewed Erin by herself, not in the presence of Mother. Erin, who was thirteen at the time, confirmed what Smith had observed and what had been reported. Erin confirmed that the home was "gross all the time," and that Mother was not cleaning the home. Erin reported that she did not feel safe in her home because her bedroom window was broken, and Mother was "gone from home almost every weekend because she goes out partying with friends at the Renaissance Festival or to her boyfriend's house." Erin described Mother as "angry, lazy, and irresponsible." Erin also confirmed that Mother took the six puppies to the veterinarian. Erin reported that Mother called her a liar and blamed Erin for the Department's involvement. Smith described this as "a major red flag."

Smith also spoke with the principal, assistant principal, and counselor at the children's school. The school authorities reiterated their concerns for Ted in that they could not administer academic testing until he obtained glasses. The school had arranged for the Lions Club to pay for the glasses. Ted appeared to be academically below grade level, and the school wanted to administer testing to help him in his academics. The school authorities also disclosed that Ted, seven-years old at the time, had "restroom accidents" at school. The school was unable to obtain dry clothing for Ted when he had an accident because they could not locate Mother.

Smith also interviewed Harris County Sheriff's Deputy Barr who knew the family. Barr confirmed Smith's concerns about the family's living conditions. Barr reported that the family had been living in tents until Barr helped them get into their home. Barr confirmed the recurrent head-lice issues with the children and the potent odor in the home caused by the dogs. Barr also confirmed concerns that Mother left the children unsupervised for long periods of time.

Smith further detailed the history of referrals to the Department including a

12

2005 referral of alleged physical abuse of Erin when Erin was 18-months old. Smith testified that the referral was ruled "unable to determine." Smith explained that "unable to determine" means that either there was not enough evidence to suggest that the alleged perpetrator committed the abuse or neglect, or there was not enough evidence to believe the allegation or rule it out. An "unable to determine" disposition also means that no petition to terminate parental rights was filed at that time.

Five years later, in 2010, the Department received a referral alleging physical abuse of Ted by Mother because Ted tested positive for marijuana at birth. That allegation was given the disposition of "reason to believe." Mother was given a service plan through FBSS and completed the services, which resulted in no petition for termination being filed.

Smith further testified that the Department received a referral when Kevin was born because Mother tested positive for marijuana at birth. Kevin tested negative, and subsequent drug tests conducted on Mother were negative. That referral was given the disposition of "ruled out."

The Department determined that the children were in an endangering environment and should be removed from Mother and placed with Jenny while the case was pending. The Department determined that a petition of termination should be filed even though the children were temporarily safe because the children lacked stability. Smith also testified that both Mother and the children could benefit from services beyond what FBSS could offer.

J.B. (John), Alex and Ted's father, testified that he intended to execute a voluntary relinquishment of his parental rights. John further testified that he believed that his children's welfare would be in danger if the children were placed with Mother. John testified that he had witnessed Mother being physically abusive to Erin when Erin was ten- or eleven-years old. John understood that if the children's

13

parents' rights were terminated the children would be entitled to Medicaid benefits as well as public college tuition. John testified that adoption by the Bakers was appropriate for the children so they could live in an environment without fear for their safety, or having to clean up dog feces. John testified that the Bakers were doing a "great job" caring for his children and that he had no concerns about his children's welfare in their care.

Melissa Brod, a supervisor with the Department, testified as the Department's representative. One of the caseworkers who worked on the case, Brandy Matthews, was unavailable for trial. Brod was familiar with the records in this case and had participated personally.

The Department created a service plan for Mother that was admitted into evidence. Brod signed the plan, and the plan was discussed with Mother over the phone. A Family Group Conference was held in which Mother participated via phone. The service plan was introduced at a status hearing, and the trial court made the plan an order of the court. The plan was not reviewed with Mother in person because Mother did not appear for the status hearing. Brod testified that Mother was aware of the plan because she told Matthews she had a job and she wanted to "work the services." The primary goal of the service plan was to equip Mother with the tools necessary to reduce or eliminate the risk of abuse or neglect.

A status-hearing order was signed in February 2018, which made the service plan an order of the court. After that order was signed, the Department reached out to Mother by phone, but her phone was no longer in service. After learning the phone was not in service, the caseworker tried to contact Mother using Facebook Messenger. Mother responded and reported that she had a job and wanted to work services. Mother told the caseworker she would provide a contact address at a later date. The next month the caseworker tried several times to reach Mother by phone,

but the phone still was not in service. The "courtesy worker" mailed a letter to Mother notifying Mother that the courtesy worker had been assigned to the case. Matthews, the caseworker, reached out again through Facebook, and Mother responded. Mother told Matthews that she would email proof of income, but the Department never received proof of income. The next month in May, both phone calls and attempts at contact through Facebook were unsuccessful. In June the Department located Mother in the Montgomery County Jail after her arrest for a probation violation. As of the time of Mother's arrest, Mother had not participated in any services required by the family service plan.

Mother was sentenced to 60 days in jail for a Harris County probation violation. The caseworker was unable to meet with Mother in the Montgomery County Jail because by the time the Department located Mother, she had been moved to Harris County. By the time the Department learned Mother had been moved to Harris County, Mother had served her sentence and had been released.

After being released from jail, Mother appeared at the August 2018 permanency hearing, and the trial court appointed an attorney for her. At that time, the case had been pending approximately seven months and Mother had not visited the children a single time. Mother was living with her boyfriend, but did not give an address to the Department. The next month the trial judge interviewed the two oldest children, Erin and Alex. The record of those interviews was not introduced at the final hearing.

The courtesy worker and the caseworker continued their attempts to contact Mother throughout the months of August and September. They called Mother's phone and her boyfriend's phone. Mother never responded to their attempts to contact her. At the end of September 2018, Mother completed an initial assessment with a psychological counselor, but did not return for the recommended counseling

sessions.

From shortly after the children were removed to the time of the final hearing, Mother did not have contact with her children. The first seven months of no contact were due to Mother's absence and refusal to respond to efforts to contact her. After Mother was released from jail, she sought visitation but it was not permitted because the children indicated they did not want to see Mother. In addition to failing to maintain significant contact with the children, Mother failed to show she could provide the children with a safe environment. Mother was ordered by the court to provide support for the children, but failed to support the children while the case was pending.

As to future plans for the children, Erin, Alex, and Kevin were to continue to live with the Bakers, who planned to adopt all the children. Ted had been hospitalized because he became physically aggressive and was a danger to Kevin. Ted experienced "behavioral issues" and was in a psychiatric hospital where he was receiving specialized treatment. The Department's goal was for Ted to receive the treatment he needed so he could return to the Bakers' home with his siblings.

At the beginning of this case, the Bakers received no financial assistance to help care for the children. After the children came into the Department's care, the Bakers became licensed foster parents.

Mike Laue, the volunteer advocate (sometimes referred to as the "Texas Court Appointed Special Advocate" or the "CASA volunteer"), testified that in making his recommendation that termination was in the best interest of the children, he considered the conditions from which the children were removed, direct conversations with the children, and conversations with other principals in the case. In describing the conditions from which the children were removed Laue noted that when he first visited the children, they were "extraordinarily anxious." Laue

attributed their anxiety to their living conditions, stating they "were afraid of going back to the – the home[.]" The children expressed concern about food, clothing, and the condition of the home. They were extremely anxious about the possibility of having to go back.

Laue had contact with the children after their removal and noted they were calmer and happier. The children were more involved in activities and their anxiety levels had diminished. Laue spoke with the children's teachers, who also saw a change in the children after their removal. The teachers noted the children's demeanor changed, and both their conduct and academic performance improved. Laue met with Ted in the psychiatric hospital. Laue was concerned that if Ted returned to Mother's care, he would not receive the treatment he needs. In the year this case was pending, Laue observed no effort by Mother to mitigate the circumstances that existed at the time the children were removed.

Laue spoke with the three older children about three months before the final hearing. He asked about their desire to remain with the Bakers. Laue testified that the children were even more adamant at that time in their desire to remain with the Bakers. Laue explained that the children were secure in knowing they had a stable home with ample food, and someone who truly cared about them and provided opportunities for their futures.

Laue described Kevin as a "bubbly little boy" whose favorite person was Jerry. Ted was described as intelligent, cheerful, and positive. Ted was diagnosed as being on the autism spectrum. At the time of the final hearing, Ted was living in residential treatment because his needs were beyond the scope of what the foster parents could provide at that time. Alex is a dancer and softball player. Alex's grades significantly improved since the removal. Erin, who was fourteen at the time of the final hearing, was significantly calmer than when she was living with Mother. Erin

still experienced apprehension in social settings but was improving. Erin and Alex told Laue that they did not trust Mother, but they trust the Bakers. Laue reported a significant emotional attachment between the foster parents and the children. The children were safe, comfortable, and happy living with the foster parents, conditions that did not exist when they were living with Mother. Laue testified that in the past year he had "seen [the] children blossom."

Jenny testified that she met Mother and her three older children shortly before Hurricane Harvey. Mother was pregnant with Kevin at the time. After Hurricane Harvey, Mother needed help with the children and needed a place to live. The family had been living in tents before the hurricane. Mother owned property, but did not own a home. The Bakers moved their mobile home onto Mother's property. Mother subsequently obtained a mobile home, which was moved to the property.

Before the children were removed, Jenny noticed that Kevin was coughing and had a fever. Jenny asked Mother to take him to the doctor, but Mother refused. Jenny took Kevin to the doctor where she learned that Kevin had not been immunized. At the time of the final hearing Kevin was doing well and achieving appropriate physical and emotional milestones.

As soon as the children were placed with Jenny, she got glasses for Alex and Ted. Alex was a generally happy child, but was experiencing anxiety through the termination process. Alex was participating in dance, choir, softball, and recorder lessons.

Jenny testified that Ted was living in a residential treatment center at the time of the final hearing. Ted experienced behavioral issues in the summer before the final hearing. Ted became aggressive and destructive. When Ted first came to live with Jenny, she had to work on his toileting habits. Ted would urinate everywhere; Jenny described it as "spraying." Ted also defecated in his pants. Ted had issues

surrounding food and eating to the degree that he continued to eat even after he was full. Ted had been diagnosed with autism and tended to exhibit aggressive behavior when he was not living in a structured environment. Ted often strayed when the family was at an outing. Jenny purchased a GPS device to place on Ted's clothing so she could keep up with him. Ted's aggressive behavior became unmanageable. At times, Ted would pick up the infant and throw him. Jenny reported Ted's behavior to the Department. The Department's courtesy worker came to the home and observed Ted's aggressiveness that Jenny described as a "125 minute fit" in which Ted was "kicking, screaming, throwing things." Jenny described the "fit" as scary. After that tantrum, Jenny took Ted to a hospital, and he was later placed in residential treatment.

Jenny described Erin as having difficulty trusting others when she first came to live with Jenny. Erin experienced anxiety about the removal. Erin appeared to be angry, and Jenny found it difficult to get close to her. Jenny observed that Mother was verbally and physically aggressive with Erin. Erin's anxiety sometimes manifested in anxiety attacks. Erin began to trust Jenny more and shared her feelings with Jenny.

After the children were removed from Mother's home, the Bakers moved to a new home with five bedrooms and two bathrooms. Each of the children had his or her own room. The Bakers' home is now a licensed foster home.

Jenny has had a stroke, which affects her health in that she occasionally drags her leg at night when she is tired. Jenny had a "good bill of health" from her doctor and managed her symptoms with medication. Jenny was able to drive and care for the children. Jerry has Parkinson's disease, which is managed by medication. Jenny described the addition of the children to the household as a "Fountain of Youth" for her and her husband.

The Department rested, and Mother called Margaret Barrientos as her first witness. Barrientos is a childhood friend of Mother's and knows the three oldest children. Barrientos testified that in her experience Mother was appropriate and bonded with her children. Barrientos never saw the home where the children were living at the time of their removal. Cristal Randolph and Timothy Tolle, who met Mother at the Renaissance Festival, also testified that Mother was a good parent.

Nickieta Trejo, the primary caseworker at the time of the final hearing, was assigned to the case approximately three months before the final hearing. Trejo testified that she had an initial phone call with Mother in which Mother agreed to make an appointment with a therapist. Mother kept the therapy appointment. Mother also participated in a psychological assessment. These were some of the only tasks Mother completed on the service plan.

Jerry testified that he and Jenny helped Mother with her home when Mother and the Bakers first moved onto Mother's property. Jenny helped clean out the inside of the house and Jerry rebuilt some walls and installed an electrical box. Jerry stopped making repairs to the home when Mother started disappearing.

Andrea Rodriguez, a friend of Mother's, testified that she did not know of any times that Mother left the children for extended periods of time. When shown pictures of Mother's home, Rodriguez testified that the home was not usually in that state. The three oldest children lived with their maternal grandmother for a period of time until the maternal grandmother passed away. Rodriguez admitted she had three encounters with the Department involving her own children. Two of the encounters involved men with whom Rodriguez was living; one encounter involved her son's allegation of sexual abuse and lack of hygiene.

Erin and Alex spoke with the trial judge with only the CASA supervisor and court reporter present. Alex read a note that the girls had written to the court. The

note read:

> [W]e've never had a real house. Kicked us out of the house so she can do her drugs. $7,000 from FEMA and wasted it on herself for drugs, party and friends. Never bought groceries. Hit us with her riding crop belt, flip flop or – her hand. Lost -- last year Mama [Jenny] and Aunt Kay bought us school clothes and supplies and they all disappeared. Mama [Jenny] helped us[.]

Alex told the court that with Jenny they "were actually able [to] do things and eat and stuff like that and with [Mother] we weren't able to do it."

The trial judge asked the girls what they would ultimately like for him to do, and Alex answered, "let us be with Mama [Jenny]." Erin said she felt the same way. Erin added, "it's more than just not having stuff. It's like the verbal and mental abuse, too. Like it's so much more than not having food." In answer to questions from the children's attorney ad litem, Erin responded that Mother "would like degrade us constantly." Specifically, Erin stated that Mother would tell Ted and her that they would "end up crazy like your father[.]"

Erin described the children's living conditions as follows:

> [O]ne time there was like a full-on hole in one of the hallways in our house. Like it was just small things like that through every place that we've lived. Like even when we did have a house, it was in horrible condition, and when we didn't, we were either in really crappy small apartments that we'd get kicked out of or hotels for like months.

> And I heard that now she's claiming that she has like this big house and that's a lie. It has to be. The only way she would have a house is because she's getting it from her boyfriend, and she doesn't ever last in a relationship with anyone because she does the same thing with the boyfriends that she did with her kids. Get all the use she can from them and then they're trash.

When the trial judge explained that he could allow them to stay with Jenny, but not terminate Mother's parental rights, both girls said they believed their mother's rights should be terminated.

After Erin and Alex spoke with the trial judge in chambers, Mother testified that she had a close relationship with Erin. Mother attributed their closeness to her young age at the time Erin was born. Near the time of the children's removal, Mother testified that her relationship with Erin became strained. Mother blamed the strain in their relationship on Jenny.

Mother explained that she did not get glasses for the children because her truck was not working properly. Mother signed a release to allow Jenny to get glasses for Ted. Mother did not know the other children needed glasses. Mother denied leaving the children alone for any period of time. When Mother worked at the Renaissance Festival, she left the children with Jenny.

Mother purchased the property on which she was living in early July 2017. She and the children lived in tents for approximately two weeks, then moved into a hotel. During July 2017 Jenny contacted Mother about renting part of Mother's property on which to place the Bakers' mobile home. Mother and Jenny agreed that the Bakers would pay rent and help Mother with construction projects. Mother had her appendix removed in August and stayed in Jenny's home while she recovered. While Mother was recovering, her mobile home was moved onto the property. Mother received $7,000 from the Federal Emergency Management Agency (FEMA) to repair the mobile home after it was damaged by flooding from Hurricane Harvey. Mother admitted that she did not comply with FEMA's requirement to provide documentation of all the repairs done with the funds.

With regard to the condition of the mobile home when the Department investigator visited, Mother explained that the home was being repaired. Mother admitted the home was cluttered but explained that the piles of laundry were left after a trip to the laundromat. Mother testified that she always answered the phone when someone from the Department called.

At the time of the second Department visit, Mother admitted there were dog feces and explained that there were ten puppies who sometimes escaped the room they were staying in. All four children were sleeping in one room because the other rooms were under construction. Mother testified that the children slept on a queen-sized air mattress. Mother did not specify whether the infant also slept on the same air mattress.

At the conclusion of the final hearing, the trial court made findings on the predicate grounds of endangerment, failure to support, constructive abandonment, failure to comply with a family service plan, and use of a controlled substance in a manner that endangered the health and safety of the children.

## II. ANALYSIS

Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings on the predicate grounds of endangerment, failure to support, constructive abandonment, failure to comply with the service plan, and use of a controlled substance in a manner that endangered the health and safety of the children. Mother also challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination is in the best interest of the children.

### A. Standards of review

Involuntary termination of parental rights is a serious matter that implicates fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve

23

that right.").

Due to the severity and permanency of terminating the parental relationship, the law in Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.F.C.*, 96 S.W.3d at 264.

The heightened burden of proof in termination cases results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (op. on reh'g). We review the legal sufficiency of the evidence by considering all evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.*; *In re D.R.A.*, 374 S.W.3d at 531. However, this does not compel us to disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing burden, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably

24

have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (internal quotation marks omitted). We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

In a proceeding to terminate the parent-child relationship brought under Family Code section 161.001, the petitioner must establish, by clear and convincing evidence, one or more acts or omissions enumerated under subsection 1 of section 161.001(b) and that termination is in the best interest of the child under subsection 2. Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## B.    Predicate Termination Grounds

The trial court made predicate termination findings that Mother committed acts establishing the grounds set out in subsections D, E, F, N, O, and P of section 161.001(b)(1) of the Family Code.

Courts have long recognized that due process "guarantees more than fair process" and "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). One of the most fundamental liberty interests recognized is the interest of parents in the care, custody, and control of their children. *See id*. 530 U.S. at 65–66 ("[T]he custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").

In parental-termination cases, due process mandates a clear and convincing evidence standard of proof. *See In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). "Due process compels this heightened standard because terminating the parent-child relationship imposes permanent, irrevocable consequences." *In re J.A.J.*, 243

S.W.3d 611, 616 (Tex. 2007).

Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there also is a finding that termination is in the child's best interest. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Due process requires, however, that when a parent has raised the issue of insufficiency of the evidence to support the trial court's findings under section 161.001(b)(1)(D) or (E) of the Family Code, an appellate court must address one of those endangerment findings to ensure a meaningful appeal. *In re N.G.*, No. 18-0508, 2019 WL 2147263, at *3 (Tex. May 17, 2019); *In re P.W.*, No. 14-18-01070-CV, 2019 WL 2352443 at *3–4 (Tex. App.—Houston [14th Dist.] June 4, 2019, no pet. h.). Due process and due-course-of-law requirements also mandate that an appellate court detail its analysis for an appeal of termination of parental rights under section 161.001(b)(1)(D) or (E) of the Family Code. *In re P.W.*, 2019 WL 2352443 at *4. In this case Mother challenges in a broad issue on appeal all of the trial court's findings on the predicate grounds for termination. We, therefore, address the trial court's endangerment finding under subsection 161.001(b)(1)(D).

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that a parent has "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger the[ir] physical or emotional well-being" and that termination is in the best interest of the children. Tex. Fam. Code Ann. § 161.001(b)(1)(D), (2).

To "endanger" means to expose the children to loss or injury or to jeopardize their emotional or physical health. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Children are endangered when the environment creates a potential for

danger of which the parent is aware but consciously disregards. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. However, it is not necessary that the endangering conduct be directed at the children or that the children actually suffer injury. *Id.*

A subsection-D inquiry focuses on the children's surroundings and environment and requires a showing that the environment in which the children were placed endangered their physical or emotional health. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) ("Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being."); *In re S.M.L.*, 171 S.W.3d at 477. "Environment" refers to the acceptability of the children's living conditions as well as a parent's conduct in the home because the parent's conduct in the home can create an environment that endangers the children's physical and emotional well-being. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *see also In re I.L.L.*, No. 14-09-00693-CV, 2010 WL 4217083, at *6 (Tex. App.—Houston [14th Dist.] Oct. 26, 2010, no pet.) (mem. op.) (although subsection D concerns child's living environment rather than conduct of parent, parental conduct certainly relevant to child's environment).

The relevant time frame for establishing that a parent "knowingly . . . allowed the child[ren] to remain in conditions or surroundings which endanger[ed] the[ir] physical or emotional well-being" is prior to the children's removal. *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). And, a factfinder may infer from a parent's past conduct endangering the well-being of the children

27

that similar conduct will recur in the future. *A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.). Subsection D permits termination based upon a single act or omission. *In re J.E.M.M.*, 532 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

"Allowing children to live in unsanitary conditions endangers their physical and emotional well-being." *In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *13 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet. h.); *see also In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.) ("[A] child's exposure to continually unsanitary living conditions … may prove endangerment.").

The record reflects that the children were living in what several witnesses described as "deplorable" conditions prior to their removal from Mother's care. Department investigator Smith testified that the home was unsanitary, contained exposed wiring, had no running water, and had an odor attributable to dog feces and urine found throughout the home. *See In re A.R.R.*, No. 01-18-00043-CV, 2018 WL 3233334, at *5 (Tex. App.—Houston [1st Dist.] July 3, 2018, pet. denied) (mem. op.) (unclean home jeopardized children's physical and emotional well-being). *See Phillips v. Tex. Dep't of Protective & Reg. Servs.*, 25 S.W.3d 348, 352, 354–55 (Tex. App.—Austin 2000, no pet.) (holding evidence sufficient to support finding children endangered by environment where home was "filthy," contained rodents, and had clothes and trash everywhere). The home did not have running water for a sustained period of time. *See In re A.R.R.*, 2018 WL 3233334, at *5 (lack of running water in home jeopardized children's physical and emotional well-being); *In re P.E.W.*, 105 S.W.3d at 777–78 (holding evidence sufficient to support finding parent placed children or allowed them to remain in environment that endangered them where home lacked running water).

Smith further noted that Ted urinated and defecated off the front porch. Rooms that were accessible to the children contained insulation, exposed screws, holes in the walls and floors, and exposed electrical wiring. Erin expressed a feeling that she was not safe in her home because the bedroom window was broken. In Mother's testimony, she admitted the three older children slept in the same room all on one air mattress. Photographs admitted into evidence showed dog feces on the floor next to the air mattress. Mother admitted at the final hearing and in her brief that "at the time of the investigation, her home was not suitable for the children." As justification for her home's unsuitable condition, Mother argued that she allowed the children to use the restroom, shower, and sleep at the Bakers' home.

Photographs of the home were admitted into evidence. One photograph of the front area of the house showed construction materials and open boxes in the room, but no furniture. The floor was covered with dog feces. Another photo showed the deflated air mattress on which the three older children slept. Next to the air mattress were several piles of dog feces. A photo of the front bedroom showed open boxes with their contents spilling out, shredded insulation, loose construction materials, and dog feces.

In addition to the deplorable living conditions, the record reflects that Mother left the children alone for extended periods of time including overnight while she went to the Renaissance Festival. Although Mother denied leaving the children alone, her testimony was contradicted by the Department investigator, the Department caseworker, the CASA volunteer, the foster parents, and the children. As the sole arbiter when assessing the credibility and demeanor of a witness, the trial court was free to discredit Mother's self-serving testimony. *See In re H.R.M.*, 209 S.W.3d at 109.

In her brief, Mother argues that "housing problems were over at the time of

trial[.]" The relevant time period, however, is not at the time of the final hearing but the time of removal. *See In re J.R.*, 171 S.W.3d at 569. The record reflects that at the time the children were removed, they were living in a home with no furniture except an air mattress, and no running water. The home contained loose construction materials, exposed electrical wiring, shredded insulation, and exposed nails. The floors of the home were covered in dog urine and feces. The children had to urinate and defecate either outside or at a neighbor's home.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court reasonably could have formed a firm belief or conviction that Mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings that endangered their physical and emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D). And, viewing the evidence in a neutral light, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings that endangered their physical and emotional well-being. *See id.* Further, we conclude that the trial court could have reconciled any disputed evidence in favor of finding that Mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings that endangered their physical and emotional well-being, or any disputed evidence was not so significant that a factfinder could not have reasonably formed a firm belief or conviction that Mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings that endangered their physical and emotional well-being. We overrule Mother's issue challenging the trial court's finding on the predicate grounds for termination.

## D. Best Interest of the Children

Mother also challenges the legal and factual sufficiency of the evidence to

support the trial court's finding that termination of her parental rights is in the best interest of the children. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

There is a strong presumption that the best interest of the children is served by keeping the children with their natural parents. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing Tex. Fam. Code Ann. § 153.131(b)); *In re D.R.A.*, 374 S.W.3d at 533. However, prompt and permanent placement of the children in a safe environment is also presumed to be in the children's best interest. *In re S.R.*, 452 S.W.3d at 366 (citing Tex. Fam. Code Ann. § 263.307(a)). Proof of acts or omissions under section 161.001(b)(1) is probative of the issue of the children's best interest. *See In re S.R.*, 452 S.W.3d at 366. The considerations that the fact finder may use to determine the best interest of the children, known as the *Holley* factors, include:

(1) the desires of the children;

(2) the present and future physical and emotional needs of the children;

(3) the present and future physical and emotional danger to the children;

(4) the parental abilities of the person seeking custody;

(5) the programs available to assist the person seeking custody in promoting the best interest of the children;

(6) the plans for the children by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re S.R.*, 452 S.W.3d at 366; *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to be considered in evaluating "whether the child's parents are willing and able to provide the child with a safe environment"). A best-interest finding does not require proof of any

unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72; *In re S.R.*, 452 S.W.3d at 366.

In reviewing the legal and factual sufficiency of the evidence to support the trial court's finding on best interest, we are mindful that the focus in a best-interest analysis is not only on the parent's acts or omissions, but on the nature of the relationship the children have with the parent. *In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012).

### 1. The desires of the children

At the time the children were removed Erin was thirteen, Alex was nine, Ted was seven, and Kevin was a newborn. As to the newborn, when children are too young to express their desires, the factfinder may consider that the children have bonded with the foster parents, are well cared for by the foster parents, and have spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). All four children have bonded with the Bakers and were thriving in their care.

At the final hearing, Erin and Alex conferred with the trial judge and told him their desires. Their testimony was unequivocal that they no longer wanted to live with Mother and that they asked that her parental rights be terminated. While the trial judge was clear with the children that he must consider factors other than their wishes, he gave them the opportunity to talk with him and explain their living conditions. Alex read a note that both girls had written in which she explained that they had "never had a real house." Alex described being excluded from their home so that Mother could "do drugs." Alex reported that Mother hit the children with a riding crop, belt, shoe, and her hand. Erin explained that their home was in "horrible condition" with holes in the walls and windows. This factor weighs in favor of termination. *See In re C.M.C.*, 273 S.W.3d 862, 876 (Tex. App.—Houston [14th

Dist.] 2008, no pet.) (child "adamant" that he did not want to return to his parents).

## 2. Present and future physical and emotional needs of the children and present and future physical and emotional danger to them

"Regarding this factor, we note that the need for permanence is a paramount consideration for the child's present and future physical and emotional needs." *In re D.R.A.*, 374 S.W.3d at 533. Establishing a stable, permanent home for a child is a compelling government interest. *Id.*

The Family Code provides a list of factors that are to be considered in determining "whether the child's parents are willing and able to provide the child with a safe environment." One of those factors is "whether the child is fearful of living in or returning to the child's home." Tex. Fam. Code Ann. § 263.307. The evidence detailed above of the endangering environment in which Mother placed the children reflects that the physical and emotional needs of the children were neglected under Mother's care. After being removed, the three oldest children received long-needed glasses. Jenny and Officer Barr bought the children clothes, school supplies, and food. The two girls testified that they often did not have food and had to use plumbing facilities outside of their house due to lack of running water in the home. In addition, the girls testified that Mother had physically disciplined them and left them unsupervised for days at a time. A parent's past dangerous behavior indicates the potential for future dangerous behavior. *In re J. I. T.*, No. 01-17-00988-CV, 2018 WL 3131158, at *17 (Tex. App.—Houston [1st Dist.] June 27, 2018, pet. denied) (mem. op.).

By contrast, the foster parents are providing the children with a safe and stable home environment. The Department's long-term permanent placement plan is for the foster parents to adopt the children. *See In re C.H.*, 89 S.W.3d at 28 (evidence about placement plans and adoption is relevant to best interest). These factors weigh

33

in favor of termination.

### 3. Acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate, and any excuse for the parent's acts or omissions

Mother testified that she was unable to get glasses for her children because her truck was not working properly. Mother also pointed to a lack of transportation to explain why she did not take Kevin to the doctor. When Mother was asked how she was able to take the puppies to the vet, she answered, "That was necessary." When asked whether glasses for her children were necessary, she explained, "I signed the piece of paper so that [Jenny] could take them to get their glasses just like she offered to do." That Mother did not understand or appreciate the necessity of her children's need for glasses or prompt medical care and prioritized the health of the puppies over her children weighs in favor of the trial court's best-interest finding.

Under all the circumstances in this case and applying the applicable *Holley* factors to all the evidence, we conclude that legally- and factually-sufficient evidence supports the trial court's finding that termination of Mother's parental rights is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

We overrule Mother's issue challenging the trial court's best-interest finding.

### III.    CONCLUSION

The evidence is legally and factually sufficient to support the trial court's finding of endangerment as to Mother under section 161.001(b)(1)(D). Having made this determination, we need not address the other predicate grounds for termination. Based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Mother's parental rights and appointing the Department as managing conservator was in the children's best interest.

Having overruled each of Mother's issues on appeal, we affirm the final order of termination.

/s/    Charles A. Spain
       Justice

Panel consists of Chief Justice Frost and Justices Spain and Poissant.